# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***People v. Harrell*, 2012 IL App (1st) 103724**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DONALD HARRELL, Defendant-Appellee. |
| District & No. | First District, Third Division<br>Docket No. 1-10-3724 |
| Filed | July 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where defendant's act, the police surveillance, and defendant's arrest after he was stopped and searched and his residence was searched all occurred in a city outside the police officers' jurisdiction, the statements defendant made were properly suppressed, because the officers were operating outside their jurisdiction without authority. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-1717; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Adrienne N. River, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, and Charles J. Prochaska, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE MURPHY delivered the judgment of the court, with opinion. Presiding Justice Steele and Justice Neville concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant, Donald Harrell, was arrested on December 17, 2009, in Maywood, Illinois, by Chicago police officers with that police department's gang investigations unit. The officers, acting on a tip from an informant, recovered approximately 6,720 grams of cannabis, 3 grams of heroin, drug paraphernalia, and a fully loaded, semiautomatic, .25-caliber handgun from his home, also in Maywood, Illinois. Defendant was charged with possession of cannabis with intent to deliver (720 ILCS 550/5(f) (West 2008)) and unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2008)).

¶ 2    Defendant moved to quash his arrest and suppress evidence, alleging that the Chicago police officers lacked authority to arrest him and did not obtain proper consent to search his attic bedroom where the drugs and handgun were recovered. Following briefing and a hearing, the trial court found that defendant was arrested for crimes committed in Maywood, Illinois, without anyone present from Maywood, state or federal police departments. Therefore, his arrest by Chicago police was found to be extraterritorial and any statements made related to his arrest were suppressed. However, the court found that defendant's stepfather had apparent authority to consent to the search of defendant's bedroom and denied defendant's motion to suppress the evidence discovered in his bedroom. The trial court denied the State's motion to reconsider. The State filed a certificate of substantial impairment pursuant to Rule 604(a) (Ill. S. Ct. R. 604(a) (eff. July 1, 2006)) and this appeal followed. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                          I. BACKGROUND

¶ 4    Defendant was arrested by the Chicago police on December 17, 2009. After defendant left from his home at 1912 South 10th Avenue, Maywood, Illinois, and entered into a red Ford Explorer with two other men, surveillance officers from the Chicago police department conducted an investigatory stop of the vehicle, curbing the vehicle at 1946 South 10th Avenue, Maywood, Illinois. The suspects were detained and returned to park in front of defendant's home. Chicago police officers were granted access to defendant's bedroom by

Arthur Gipson, described as co-owner of the residence in the police report.

¶ 5 The officers discovered approximately 6,720 grams of cannabis, 3 grams of heroin, drug paraphernalia, and a fully loaded, semiautomatic, .25-caliber handgun. Defendant was charged with possession of cannabis with intent to deliver (720 ILCS 550/5(f) (West 2008)) and unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2008)). Defendant filed a motion to quash arrest and suppress evidence alleging that the Chicago police officers lacked authority to arrest him and did not obtain proper consent to search his bedroom.

¶ 6 At the hearing on the motion, Arthur Gipson testified that he was defendant's stepfather and that in December 2009, he lived with his wife, Laquita Hunley, and defendant at 1912 South 10th Avenue in Maywood, Illinois. Gipson did not pay rent or make any mortgage payments on the house. Further, Gipson was not on the title for the house.

¶ 7 On December 17, 2009, Gipson was at home alone around 2:50 p.m. when a police officer came to the front door. The officer informed Gipson that they had defendant in custody, they believed there was cannabis in the house, and they sought Gipson's consent to search the premises. Gipson testified that he signed the consent, but admitted that defendant did not give him permission to do so and neither he nor his wife had recently gone into defendant's room. The police then searched the attic where defendant resided and then the entire house. Gipson did not accompany the police officers.

¶ 8 On cross-examination, Gipson testified that he was unsure if he had ever gone in defendant's room in the 20 years he lived in his wife's house and defendant never instructed him to stay out of his room. Gipson testified that the police did not ask if he owned the home, only if he lived there. He stated that he was given the option to consent to the search. However, he was told that if he did agree to a search, the homeowner would not be responsible for whatever was found, but if he waited, whatever was found would be charged to the homeowner. Gipson read the consent form and signed it before the officers began their search of defendant's room. Gipson testified that he had to return to work and was told the officers eventually inspected the whole house. On redirect, Gipson testified that he returned home about three or four hours later and saw defendant in the house with police officers and was presented with a search warrant.

¶ 9 Defendant testified that at the time of his arrest, he lived with his mother and Gipson at 1912 South 10th Avenue in Maywood, Illinois. Defendant utilized the attic of the house as his bedroom. Defendant testified that in the afternoon of December 17, 2009, he left his house and entered the back door of his friend's vehicle. Right after the vehicle started down the block, the police stopped the car, presented their guns, and told defendant to get out of the car. Defendant testified that the police searched him and the two other occupants.

¶ 10 Defendant testified that the police did not find any drugs or guns, but they handcuffed defendant and the other men and took them back to defendant's address. The police did not present an arrest or search warrant and did not request identification. The policemen did not request defendant's permission to search his home, but he watched them approach the door and then go inside. Defendant remained inside the vehicle the entire time.

¶ 11 Sergeant Darryl Spencer of the gang investigations unit of the Chicago police department testified that on December 17, 2009, he was at 1912 South 10th Avenue, Maywood, Illinois.

Spencer was there along with other officers to investigate information from a confidential informant. The informant had just left the building after visiting a black male in the attic where he observed at least four to five pounds of cannabis. Spencer testified that when they formulated the plan to conduct a surveillance he contacted the Chicago police department's operation command center and the Maywood police department that they would be conducting surveillance. Spencer did not recall with whom he spoke.

¶ 12    Spencer testified that he was working with five other officers and they were all plain clothed and in unmarked squad cars utilizing push-to-talk radios to communicate. At about 2:30 p.m., one officer reported that he observed three black males, one matching the description of the man given by the informant, exit 1912 South 10th Avenue, Maywood, Illinois, and enter a red Ford Explorer. The officers saw the men enter the vehicle and begin to drive southbound and they stopped the vehicle. Spencer testified that he approached the vehicle and saw a man, defendant, in the front passenger seat who matched the informant's description.

¶ 13    Spencer did not observe a gun drawn. He learned that defendant identified himself and indicated that he lived at 1912 South 10th Avenue in Maywood, Illinois, and the officers proceeded to the home. Spencer was unaware whether defendant was asked if they could search the home. Spencer approached the door with another officer and Gipson answered. Spencer testified that he explained the information they received concerning cannabis in the attic and asked for verbal consent to search the attic. Gipson related that he was not aware of any narcotics in the house and consented to the search of the attic.

¶ 14    Spencer testified that the other officers obtained a consent to search form and asked Gipson if he understood it. Gipson stated that he did and signed the form. Gipson also stated that he was unaware whether defendant did or did not give consent to search his bedroom. Spencer and three of his partners entered the residence and searched only the attic and Gipson accompanied them the whole time. The officers recovered approximately 7,000 grams of cannabis, about 3 grams of heroin, a .25-caliber semiautomatic pistol, numerous rounds of ammunition, and equipment commonly used to package narcotics. In addition, Spencer recovered several pieces of mail addressed to defendant as proof of residence.

¶ 15    Spencer testified that when they completed this search, defendant was placed in custody. According to the police report, when he was placed into custody and read his *Miranda* rights, defendant admitted to the officers that " 'the drugs are not mine, I'm holding them for a friend named "Trell." He paid me with two ounces of weed to hold his stuff, but the pistol is mine. You won't find anything else in the house. I keep it all in my bedroom.' " The report also noted that defendant indicated that he " 'got [the handgun] about a year ago off the streets.' "

¶ 16    At some point after 6:45 p.m., Officer Villa returned with a search warrant and searched the entire residence. Spencer testified that he then notified the Maywood police department. However, no officers other than the Chicago police officers took part in the surveillance, searches or arrest.

¶ 17    On cross-examination, Spencer testified that he did not prepare any written reports for this case, but signed off on Officer Villa's report. Spencer testified that Gipson told him he

was co-owner of the home; however, that was not indicated in Officer Villa's report while it was in the arrest report. While Spencer testified that he did not see any handcuffs at the time they stopped the vehicle and initially approached Gipson to search the house, he admitted that the report indicated that all three individuals, including defendant, were detained for investigative purposes but they were not placed in handcuffs and were free to leave. Spencer admitted that no search warrant was obtained or presented until after the cannabis was discovered, but testified that the process of obtaining one was started prior to the initial search.

¶ 18    The trial court conducted further examination to clear up some issues. Spencer testified that he first saw defendant and the other individuals in the vehicle when it was stopped. He then relocated to 1912 South 10th Avenue and remained in the house for most of the time until after defendant was brought back into the house and Villa returned with the search warrant. Spencer testified that defendant was in custody during this time and placed under arrest after they found the cannabis, approximately a half hour after the police stopped the vehicle. Finally, he testified that he provided no particulars when he contacted the Maywood police department about the surveillance they were conducting.

¶ 19    The parties provided closing argument on the motion. The trial court found that there was no offense committed in Chicago, there was no request to Maywood police to see if they wanted assistance, and did not clear their surveillance with any detailed information. The court found that there was no doubt that defendant was in custody, not free to leave, and, therefore arrested without warrant. However, the trial court reserved ruling on the issue of whether the Chicago police had authority to make an arrest. The trial court found that Gipson had apparent authority to consent and the police were justified in relying on that consent in their initial search.

¶ 20    At the next hearing, the trial court reiterated the findings noted above. In addition, it took judicial notice that the City of Maywood is not adjacent to the City of Chicago. Further, it stated that the language of the Illinois Municipal Code (65 ILCS 5/7-4-7, 7-4-8 (West 2010)) about police districts "is to make or instill common sense in neighboring municipalities['] ability to seek assistance from police officers in adjoining jurisdictions" and that allowing police to investigate crimes in other municipalities "would create chaos" and be "absolutely absurd." Since the police did not observe any activity within their jurisdiction, the trial court found that they had no authority to stop and put defendant into custody and it suppressed any statements defendant made related to his arrest. With respect to the search of defendant's bedroom and home, the trial court reiterated that Gipson had apparent authority to consent to the search and that the police were not required to undertake an investigation into his authority.

¶ 21    The State filed a motion to reconsider and argued that section 7-4-7 of the Illinois Municipal Code (65 ILCS 5/7-4-7 (West 2010)) (Municipal Code) defined the territory of a police district as the entire county, thereby granting the officers police powers throughout the county. The trial court again rejected this argument, finding that the Municipal Code could not be read that broadly, but limited police authority to actually adjoining municipalities. The State filed a certificate of substantial impairment pursuant to Illinois Supreme Court Rule 604(a) (eff. July 1, 2006) and this appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23        The State argues that the trial court erred by quashing defendant's arrest and suppressing statements made by defendant to the police because it improperly found that the Chicago police officers lacked authority to investigate and make an arrest in Maywood, Illinois. The State also argues that, even assuming the Chicago police officers lacked authority to investigate and arrest defendant in Maywood, the trial court erred in suppressing defendant's statements identifying himself, providing his address, and admitting to possessing the cannabis and handgun because they were a result of a lawful *Terry* stop and intervening probable cause.

¶ 24        It is important to note that the authority of the Chicago police department to seek consent and the consent to search granted by Gipson are not issues presented to this court on appeal and have not been fully explored. Accordingly, we do not consider the validity of the search of defendant's home or the trial court's finding that the physical evidence was properly seized and admitted. The issue we consider is the State's assertion that the trial court erred in suppressing defendant's statements.

¶ 25                       A. Extraterritorial Investigation and Arrest

¶ 26        The issue of the officers' jurisdiction and authority is a matter of statutory interpretation and our review is *de novo*. *People v. Tidwell*, 236 Ill. 2d 150, 156 (2010). In construing a statute, the primary objective of this court is to give effect to the intention of the General Assembly in enacting the statute. *Id.* The best indicator of the legislature's intent is the plain and ordinary meaning of the language of the statutory section and the entire statute as a whole. *People v. Davison*, 233 Ill. 2d 30, 40 (2009). Where the language is clear, we apply the statute without resort to further aids of statutory construction such as legislative history to ascertain the legislative intent. *People v. Maggette*, 195 Ill. 2d 336, 348 (2001).

¶ 27        The State contends that sections 7-4-7 and 7-4-8 of the Municipal Code (65 ILCS 5/7-4-7, 7-4-8 (West 2010)) provide statutory authority for the Chicago police officers' actions in arresting defendant in Maywood. Alternatively, it argues that section 107-4(a-3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-4(a-3) (West 2010)) provides additional authority for the police officers' actions. Section 7-4-7 of the Municipal Code defines a police district as "[t]he territory which is embraced within the corporate limits of adjoining municipalities within any county in this State." 65 ILCS 5/7-4-7 (West 2010). Section 7-4-8 follows this definition and establishes the authority of police by providing, in full:

> "The police of any municipality in such a police district have full authority and power as peace officers and may go into any part of the district to exercise that authority and power. For these purposes the mayor of any municipality in the district, and the chiefs of police therein, shall use the police forces under their control anywhere in the district." 65 ILCS 5/7-4-8 (West 2010).

¶ 28        Section 107-4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-4 (West 2010)), entitled "Arrest by peace officer from other jurisdiction" provides, in pertinent part:

-6-

"(a-3) Any peace officer employed by a law enforcement agency of this State may conduct temporary questioning pursuant to Section 107-14 of this Code and may make arrests in any jurisdiction within this State: (1) if the officer is engaged in the investigation of an offense that occurred in the officer's primary jurisdiction and the temporary questioning is conducted or the arrest is made pursuant to that investigation; or (2) if the officer, while on duty as a peace officer, becomes personally aware of the immediate commission of a felony or misdemeanor violation of the laws of this State; or (3) if the officer, while on duty as a peace officer, is requested by an appropriate State or local law enforcement official to render aid or assistance to the requesting law enforcement agency that is outside the officer's primary jurisdiction; ***. While acting pursuant to this subsection, an officer has the same authority as within his or her own jurisdiction.

(a-7) The law enforcement agency of the county or municipality in which any arrest is made under this Section shall be immediately notified of the arrest." 725 ILCS 5/107-4(a-3), (a-7) (West 2010).

¶ 29   The State argues that the language of the Municipal Code clearly provides that police officers of a municipality are given statutory authority to unilaterally exercise police powers as peace officers in other municipalities within the same district. The State maintains that the trial court erred in applying a narrow construction of "police district" that is not supported by case law. It argues that this was exacerbated by the trial court's interjections during argument and refusal to allow the prosecutor to fully develop or support the argument it makes now, that the Chicago police officers acted within their authority.

¶ 30   The State points to *People v. Kirvelaitis*, 315 Ill. App. 3d 667 (2000), as well as *Harroun v. Addison Police Pension Board*, 372 Ill. App. 3d 260 (2007), and *People v. Carraher*, 199 Ill. App. 3d 965, 970 (1990), to advance the theory that the Municipal Code defines a police district as the same county for municipalities "adjoined" within the boundaries of that county. In *Kirvelaitis*, the defendant argued that his arrest for speeding and driving while under the influence was without authority and the suspension of his driving privileges must be rescinded. The defendant was driving outside of any municipality when he was observed by a police officer with the Village of Woodridge, Du Page County. The defendant was observed driving 67 miles per hour with a posted speed limit of 45 miles per hour. The officer testified that he was not certain if the defendant was within the municipal boundaries, but activated his radar when he saw the speeding vehicle and then stopped and arrested defendant. The trial court found that, while defendant was arrested outside the officer's jurisdiction, the arrest was proper as a citizen's arrest. *Kirvelaitis*, 315 Ill. App. 3d at 668-69.

¶ 31   The Second District of this court reversed the finding of the trial court, outlining permissible bases for the officer to have jurisdiction under the above statutory provisions. *Id.* at 669-71. The court highlighted that an officer has authority to arrest a defendant within his own police district, when the officer is investigating an offense within the officer's jurisdiction and an arrest is made outside the jurisdiction under that investigation, when the officer becomes aware of a felony or misdemeanor outside the jurisdiction while on duty, or as a private citizen. *Id.* The State focuses on the court's statement in this discussion that "an officer has the authority to arrest a defendant when the defendant is in a municipality that is

-7-

in the same county as the officer's jurisdiction. 65 ILCS 5/7-4-8 (West 1998); *People v. Marino*, 80 Ill. App. 3d 657, 661-62 (1980)." *Id.* at 669-70.

¶ 32    The State notes that, despite this, the *Kirvelaitis* court found that the officer had no authority because the defendant was in no municipality at all or in a municipality outside the officer's county. Therefore, it concluded that he had no authority to arrest the defendant pursuant to section 7-4-8 of the Municipal Code. *Id.* at 671. Further, the *Kirvelaitis* court added that its decision would be different if the defendant had been in DuPage County at the time. However, since the officer did not provide evidence that the defendant was in Woodridge, he had no authority beyond that of a private citizen and could not use the powers of his office, including a radar gun, to make the arrest. *Id.* at 672.

¶ 33    The State notes that the holding in *Kirvelaitis* was invoked, and expanded, in *Harroun*. In *Harroun*, the appellate court found that, since the Municipal Code provides statutory authority for an officer within the same county as the officer's jurisdiction, the plaintiff, a police officer for the Village of Addison, Illinois, had the authority to act when off duty and intervening in a burglary at his neighbor's Bloomingdale home. Therefore, the court reversed the denial of the officer's line-of-duty pension payout for disabling injuries that he suffered in intervening. *Harroun*, 372 Ill. App. 3d at 265. The State concedes that the facts of *Harroun* "are somewhat distinguishable," but asserts that the court's interpretation of the statute and *Kirvelaitis* supports its interpretation of extrajurisdictional authority.

¶ 34    The State also points to the legislative history expanding the jurisdiction and powers of police officers and the cases interpreting these statutes to argue that a broad reading of the jurisdictional provisions is proper. The State notes that despite its amendments to the statute following these cases, the failure to clarify demonstrates the legislature's presumed acquiescence in the holdings. *Miller v. Lockett*, 98 Ill. 2d 478, 483 (1983). The State highlights the language used in *People v. Durham*, 71 Ill. App. 3d 725 (1979), to claim that ratification of section 107-5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, ¶ 107-5(c)) expanding the "fresh pursuit" doctrine to allow arrest "anywhere within the jurisdiction of this State" "lays to rest the notion that a police officer is limited by the concept of territorial boundaries or jurisdiction when making an arrest." *Id.* at 727.

¶ 35    The State asserts that this broad reading of section 7-4-8 is supported by *Carraher*. In *Carraher*, which followed *Durham*, the court considered the appeals of two defendants observed speeding or driving recklessly in Sycamore, Illinois, by Sycamore police officers, each of whom followed the defendants into unincorporated De Kalb County. One of the defendants declined to perform field sobriety tests and later refused to submit to a breath test while the second defendant failed a field sobriety test. Each defendant was charged with a moving violation and drunk driving. *Carraher*, 199 Ill. App. 3d at 966-68. The trial court found the arrests were made outside the officers' jurisdiction and quashed the defendants' arrests and rescinded the summary suspension of their driving privileges. *Id.* at 968.

¶ 36    On appeal, the *Carraher* court reversed the trial court's orders. The court quoted the language from *Durham* cited above and the passage of section 107-5(c) to find that the exception to officers' authority to make warrantless arrests outside of their jurisdictions had been expanded. *Id.* at 970. The court found that the officers observed the moving violations

within city limits, establishing probable cause, and therefore, under the amended statute and cases, including *Durham*, the officers had authority to arrest the defendants anywhere within Illinois. Furthermore, the court found that the officers also acted within their lawful authority as police officers when, after they observed indications that the defendants were under the influence of alcohol, they detained the defendants for the purpose of a limited investigation. *Id.* at 971-72. In addition, the State cites to *People v. Vargas*, 277 Ill. App. 3d 289, 297 (1995), where this court found it permissible for City of Schaumburg, Illinois, police to continue to lead an investigation that began in Schaumburg, but moved to Hoffman Estates, Illinois, because, as in this case, the Schaumburg police contacted Hoffman Estates but continued to lead the investigation. The State asserts that this broad reading of police authority and section 7-4-8 provide a basis for finding authority in the instant case.

¶ 37    The State adds anecdotal evidence of Maywood's successful reduction in crime rates and partnerships with other communities in securing this reduction to support its argument that this was not only beneficial to Maywood, but why the Maywood police's acquiescence was the same as authorization. Along this line, the State notes that section 107-4(a-3)(3) grants jurisdiction to question and arrest to an on-duty peace officer who is requested to render aid or assistance because an appropriate state or local law enforcement official requested such assistance. 725 ILCS 5/107-4(a-3)(3) (West 2008). It contends that, given the expansion of authority detailed above, the difference between requesting assistance and tacitly authorizing action is negligible and Maywood's lack of objection to the officers' surveillance supports a finding the Chicago policemen were authorized pursuant to the statute.

¶ 38    First, as the State concedes, *Vargas* involved adjacent communities and is clearly distinguishable from this case. Second, the State incorrectly dismisses the trial court's conclusion that section 107-5(c) "has nothing to do with this case." The trial court correctly concluded that this section is dependent upon a finding that section 107-4 conferred jurisdiction to the arresting officer(s) prior to exercising authority to make an arrest. While an arrest may be made anywhere in the state, a police officer must have jurisdiction and authority to act pursuant to that section.

¶ 39    Defendant argues that there was no evidence presented in this case for the Chicago officers to invoke section 107-4(a-3). Indeed, there was no evidence that: the offense occurred anywhere but in Maywood; there was any immediate commission of a crime; or Maywood requested assistance from the City of Chicago on this issue. Accordingly, section 107-4(a-3) is not applicable and this issue may be resolved by addressing the State's first contention that the arrest was proper pursuant to section 7-4-8.

¶ 40    Defendant argues that the case law the State relies upon does not support its argument that the Chicago police officers had authority to arrest defendant in Maywood under the facts of this case. First, the State correctly points out that we may dispose of defendant's argument that the State has disavowed the holding in *Kirvelaitis*, because it has argued in a separate appeal that the *Kirvelaitis* holding was erroneous. This is irrelevant. A party involved in separate appeals is not bound by different arguments advanced in the separate cases. However, defendant's argument that the holding in *Kirvelaitis*, upon which the State relies, is erroneous is a relevant argument.

¶ 41   The State attempts to apply the language in *Durham* and *Kirvelaitis* to expand the jurisdiction of police officers. Defendant maintains that the plain language of the statute does not support the State's argument. He asserts that this court should uphold the trial court and follow those courts that have held that the plain language of the statute requires applying the term "adjoining" to mean municipalities that actually share a border. *People v. Lahr*, 147 Ill. 2d 379 (1992); *Marino*, 80 Ill. App. 3d 657.

¶ 42   While, as the State argues, *Marino* was decided prior to the statutory amendments, it is nonetheless the support cited for the key passage in *Kirvelaitis*. In *Marino*, the court considered whether members of the Chicago police department had authority to make a warrantless arrest in Du Page County for a crime committed in Du Page County. Specifically, the cited passage from *Marino* reads:

> "Pursuant to the authority conferred by section 7-4-8 of the Code [citation], the police of any municipality in a police district may enter any part of the district 'to suppress a riot, to preserve the peace, and to protect the lives, rights, and property of citizens.' These sections have long been construed as extending the power of local police into adjoining municipalities within the same county." *Id.* at 661-62.

¶ 43   The *Marino* court continued its analysis to explain and distinguish *Durham*. The court noted that *Durham* was distinguishable because it was specifically limited to where the offense has occurred within the same jurisdiction as the police officer's. *Id.* at 662. Consequently, the *Marino* court found that *Durham* did not govern the situation where Chicago police officers made a warrantless arrest for a crime committed in Du Page County. *Id.*

¶ 44   As noted, the State argues that the real test is whether municipalities are "adjoined" within the same county. The State attempts to apply the language of *Durham* and *Kirvelaitis* to expand the meaning of "adjoining," thereby expanding the police officers' authority. However, from the analysis of the cases above that underlie *Kirvelaitis*, we find that the *Kirvelaitis* court overstated these holdings and the trial court properly found that the officers did not have authority to act in Maywood.

¶ 45   Furthermore, these cases are distinguishable on key facts from the instant case. *Durham* involved an arrest made by county sheriff's officers, an important factor in considering the verbiage cited by following cases and focused on by the State that an officer may make a warrantless arrest in an adjoining county. In addition, the officer in *Durham* had probable cause to believe the defendant committed a crime within his jurisdiction. Similarly, *Carraher* and *Vargas* both involved situations where the defendants were observed violating the law within the officers' jurisdiction.

¶ 46   In the instant matter, defendant's act, the police surveillance, the stop and search of defendant and his home, and defendant's arrest all occurred outside the officers' jurisdiction. Accordingly, we uphold the trial court's holding that the statute requires municipalities to actually share a border for a police officer to invoke authority pursuant to section 107-4 and the facts of this case do not support the warrantless arrest of defendant. As a result, the trial court was correct in quashing defendant's arrest and suppressing his statements made related to his arrest.

¶ 47                                    B. Exclusionary Rule

¶ 48     The State next argues that, even if this court finds the Chicago police lacked authority to investigate and arrest defendant, defendant's statements should not be suppressed because his arrest was the result of a lawful *Terry* stop and supported by probable cause. The State notes that the sections cited above granting the police authority exist to promote the interests of law enforcement agencies and do not create any personal rights to a defendant. It does not challenge the factual determinations of the court, but maintains that the trial court erred in its legal conclusion that defendant was in custody when the vehicle was stopped and suppressed defendant's statements that he lived at 1912 South 10th Street and that the marijuana and handgun were his was in error.

¶ 49     In reviewing a trial court's ruling on a motion to suppress, we accept the court's findings of fact unless they are against the manifest weight of the evidence. The court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). In doing so, we may properly consider the testimony given at trial in addition to that provided at the suppression hearing. *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 50     The United States and Illinois Constitutions guarantee citizens the right to be free from unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6. In *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the United States Supreme Court held that a police officer "may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity." See *People v. Gherna*, 203 Ill. 2d 165, 177 (2003). In addition, the Code of Criminal Procedure of 1963 provides that a peace officer, after having identified himself as such, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit, or has committed a criminal offense. 725 ILCS 5/107-14 (West 2010). While reasonable suspicion is a less demanding standard than probable cause, the fourth amendment requires at least a minimal level of objective justification for making the stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

¶ 51     The State asserts that the stop of defendant was not an arrest, but a permissible investigatory *Terry* stop. The State contends that the trial court erred in determining that defendant was not free to leave or decline the officers' request for information until after the police searched the home. The State argues that it had specific articulable facts and reasonable inferences drawn from the officers' experiences to justify stopping the vehicle to confirm that the man who matched the informant's description was defendant. The State maintains that it was deprived of the opportunity to further develop the record regarding the officers' knowledge of the informant's reliability because defense counsel's objection to this line of questioning was sustained and defendant should not be allowed to capitalize on the void of information on this issue of record. Further, the State notes that while there were several officers present, they did not have their guns drawn and there was no indication that any officer touched defendant and defendant's testimony to the contrary is unbelievable as

he was impeached and his version is self-serving and incredible.

¶ 52     The State adds that once Gipson consented to the search of the home, the search was lawful and supported the detention of defendant. *Muehler v. Mena*, 544 U.S. 93, 98 (2005). The State argues that once the drugs and weapon were recovered, the officers had probable cause to arrest defendant. It asserts that this was independent of the initial stop of the vehicle and broke the causal connection between the first illegal arrest and his subsequent statement. *People v. Johnson*, 237 Ill. 2d 81, 94 (2010). Under *Johnson*, factors to consider whether there is a break in the causal connection include: "(1) the proximity in time between the arrest and the statement; (2) the presence of intervening circumstances; (3) the flagrancy of the police misconduct; and (4) whether *Miranda* warnings were given before the statements were made." *Id.* at 93. The State contends that defendant was placed into custody after the illegal items were recovered, defendant waived his *Miranda* rights, and defendant then made the statements that were suppressed by the trial court.

¶ 53     The State argues that our supreme court recently considered this issue in an analogous case where it found the trial court properly refused to apply the exclusionary rule. *People v. Galan*, 229 Ill. 2d 484 (2008). In *Galan*, the Chicago police department's narcotics and gang investigation section received information from an informant that the defendant was storing, selling and manufacturing large amounts of marijuana from his Chicago residence and it initiated surveillance. *Id.* at 488. The police observed the defendant twice enter and leave the residence with a brown box each time to take the boxes to his truck. The defendant repeatedly looked around while loading the boxes and also as he drove away. *Id.* at 488-89. The officers continued their surveillance and observed him driving erratically, eventually deciding to stop the vehicle and investigate as the defendant approached the Skyway on-ramp. *Id.* at 490.

¶ 54     The officers approached the vehicle with their guns drawn, holstering the guns after assuring it was safe. The officers smelled a strong odor of cannabis and the defendant informed the police he had " 'weed' " in the boxes in the car. *Id.* at 490-92. The defendant was placed under arrest and brought back to his residence, where he signed a consent-to-search form, and the police searched the home and recovered a large amount of currency, pistols and drugs. *Id.* at 491. The defendant moved to quash his arrest and suppress evidence, arguing that the officers lacked jurisdiction to arrest him in Indiana and failed to follow Indiana statutory requirements in effecting the arrest and search of the vehicle. *Id.* at 494-95.

¶ 55     Our supreme court affirmed the trial court's denial of the defendant's motion. The court noted that the exclusionary rule is a judicially created rule and is not reflexively applied, but it is to be applied as a last resort only after assuring that the benefits of deterrence outweigh the costs of suppressing evidence. *Id.* at 521-22. The court found the arrest was a proper result of the officers' pursuit of a suspect they believed was engaged in drug trafficking and attempting to escape. *Id.* at 514. There was no evidence of police misconduct or willful disregard of Indiana's laws while arresting the defendant; accordingly, excluding the evidence was not necessary. *Id.* at 524.

¶ 56     The State concedes that the *Galan* court cited to *People v. Carrera*, 203 Ill. 2d 1, 11 (2002), for the proposition that the exclusionary rule is applicable where police effectuate

an extraterritorial arrest without authority. It further concedes that the facts of *Carrera* are also similar to the instant matter; however, it asserts the holding was narrowly framed in that case. The Chicago police officers in *Carrera* surveilled the defendant at his Franklin Park home, followed him to a storage unit in Schiller Park and returned to Franklin Park, where the defendant was arrested. *Id.* at 3. The court found that the officers did not have authority to make the arrest; however, it held so because section 7-4-8 had been declared facially unconstitutional and it was as if it had never been enacted and the officers could not act in good-faith reliance upon the statute. *Id.* at 11.

¶ 57    The State contends that the facts of this case are analogous, and the outcome should be the same, as that in *Galan*. It notes that the evidence in this case demonstrates that the officers did not abuse their powers or violate defendant's fourth amendment rights, performing a valid *Terry* stop and authorized search. The officers contacted Maywood police to inform them of the surveillance and they acquiesced in the operation. Accordingly, the State argues that as in *Galan*, any deterrent effect of applying the exclusionary rule would serve no purpose. In contrast, with the State acknowledging that the case against defendant would be substantially impaired, the societal costs would be much greater in this case.

¶ 58    The State argues that, unlike *Carrera*, the arrest in the instant case was not made pursuant to an unconstitutional statute and, as in *Galan*, the purpose for applying the exclusionary rule would not be served and depriving the people the use of volunteered statements would be detrimental. The State adds that our supreme court has considered this point and recognized that barring voluntary statements through the exclusionary rule would cause great social cost over minimal deterrent effect. *People v. Willis*, 215 Ill. 2d 517, 531-34 (2005). Therefore, the State concludes that, because defendant's statements were volunteered during the course of constitutional investigation and arrest, even if the police were without statutory authority to investigate and arrest, the exclusionary rule should not be applied.

¶ 59    Defendant counters that there was no justified *Terry* stop. He maintains that no independent evidence outside of the information from the informant was presented to support a reasonable inference that he was involved in criminal activity. He notes that there was testimony that, at a minimum there were three police officers that approached the vehicle initially. Further, there was testimony that the officers had their weapons drawn and that defendant and the other occupants of the vehicle were handcuffed. He concludes that this does not constitute a *Terry* stop but, as the trial court concluded, constituted an arrest as defendant was intimidated by the show of force and believed he was not free to leave.

¶ 60    Because the police lacked probable cause at this point, he argues the arrest was improper. Defendant notes that, even if the officers' testimony was believed, there was nothing presented by the State to counter defendant's version of the facts. Under the police testimony, defendant was detained and moved back to in front of his home, where he remained for 20 minutes. Defendant asserts that these facts demonstrate that the trial court was correct in determining that defendant was arrested and not merely stopped for an investigatory *Terry* stop and defendant's first statements to the police were properly suppressed.

¶ 61    Further, defendant contends that the State failed to present sufficient evidence to support a finding of reasonable suspicion to support a *Terry* stop. He notes that it is important to

determine if an informant's information forms a sufficient basis, including considering the quality and content of the information. *People v. Salinas*, 383 Ill. App. 3d 481, 492 (2008). Defendant responds to the State's claim that this should not be considered because defendant's objection at trial foreclosed the opportunity to elicit testimony on the informant by noting that it is the State's burden to properly establish the record and make an offer of proof for any evidentiary dispute.

¶ 62    Finally, defendant argues that the State failed to raise the issue of intervening probable cause at trial and has forfeited the argument that this supports inclusion of defendant's statements. Defendant argues that he was unable to develop this issue before the trial court and the State should be foreclosed from advancing it here. Otherwise, defendant argues he could have shown that Gipson's consent to search was obtained only as a result of the unlawful stop and arrest of defendant and, therefore, recovery of the contraband would not be independent of the arrest. Alternatively, defendant argues that even if not forfeited, the State's claim should be rejected because the police did not have authority to request consent or conduct the search in Maywood. Therefore, defendant claims, the State did not and could not properly obtain probable cause to arrest defendant and the exclusionary rule should apply to suppress his statements.

¶ 63    We agree with defendant that the State's argument that the officers simply conducted a *Terry* stop fails. Even ignoring the lack of evidence concerning the quality and content of the informant's information presented by the State, the evidence presented at the hearing supports the trial court's finding. The State's argument on this point would require this court to ignore the findings of fact and credibility by the trier of fact and only follow the testimony of the police officer. The trial court found defendant's testimony credible and determined that he was arrested and detained, and that this was not a *Terry* stop and does not support overruling the trial court's order.

¶ 64    With respect to application of the exculsionary rule to his initial statements, we find it important to consider the facts of this case in comparison to those in *Galan*. Unlike *Galan*, the instant case does not involve surveillance of any illegal or suspicious act within the jurisdiction of the police officers. Also, unlike in *Galan*, the police officers in this case did not recover any illegal drugs from the car when they stopped defendant. Rather, defendant was spotted leaving his house and entering the vehicle without any suspicious packages or mannerisms. This is quite unlike the defendant's actions in *Galan*, where the defendant's stop was preceded by suspicious activity and his voluntary statements were related to the immediate discovery of illegal drugs in his vehicle. In this case, there is a stronger argument that the deterrent effect of applying the exclusionary rule could serve the purpose of assuring the police act within their authority.

¶ 65    Furthermore, Justice Freeman noted in his dissent in *Galan* that the decision in *Carrera*, while not factually directly on point with *Galan*, upheld the exclusion of evidence resulting from an unlawful, extraterritorial arrest. *Galan*, 229 Ill. 2d at 542-44 (Freeman, J., dissenting, joined by Kilbride, J.). While *Carrera* involved a statute that was void *ab initio* on constitutional grounds, Justice Freeman opined that the *Galan* majority was too quick to distinguish the cases because the opinion was animated by its reliance on *Lahr* and the proposition that " 'Illinois law is settled that the exclusionary rule is applicable where the

police effectuate an extraterritorial arrest without proper statutory authority.' " *Id.* at 543 (quoting *Carrera*, 203 Ill. 2d at 11). As in this case, where we have found the officers were not acting within legal authority, Illinois law holds that the exclusionary rule is applicable to bar defendant's initial statements to the police and the trial court correctly suppressed defendant's initial statement.

¶ 66    We also agree that defendant's second statement, made after the drugs and weapon were discovered, was also properly suppressed. As noted above, the trial court found the police properly obtained valid consent to perform the search and denied defendant's motion to suppress that physical evidence. Whether the consent was valid and whether the Chicago police officers had any authority to seek the consent or make the search are not issues before this court and would only be brought to this court upon an appeal by defendant.

¶ 67    As addressed in *Johnson*, despite an initial illegal detention and arrest, probable cause that is developed independent of that initial arrest may support a second arrest without the need to release the defendant. *Johnson*, 237 Ill. 2d at 94. However, this review under *Johnson* presupposes that the officers have authority to act and we have found that the Chicago police officers were acting without authority. It would seem apparent that the Chicago police officers who were acting without authority in stopping and arresting defendant in the first instance also had no authority to seek consent or undertake a search under the guise of authority as police officers. In any event, whether or not Gipson had authority to consent is of no matter to the disposition of the State's appeal and the reasoning above that the officers were operating outside of their jurisdiction without authority holds despite the discovery of the illegal drugs and handgun. Because they had no authority to arrest defendant, both sets of statements were properly suppressed by the trial court.

¶ 68                                    III. CONCLUSION

¶ 69    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 70    Affirmed.